**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

Michael Stice and
Eric Meiners,

Plaintiffs,

v.

Dentsply International,

Defendant.

Civil No. 00-2736 (DWF/SRN)

**MEMORANDUM OPINION AND ORDER**

---

Kelly Jeanetta, Esq., Maurice W. O'Brien, Esq., and Nancy J. Miller, Esq., Miller O'Brien, 1208 Plymouth Building, 12 South 6th Street, Minneapolis, Minnesota 55402, on behalf of Plaintiffs.

Jeffrey B. Oberman, Esq. and Kristin L. Boetticher, Esq., Oppenheimer, Wolff & Donnelly, 3400 Plaza VII Building, 45 South 7th Street, Minneapolis, Minnesota 55402, on behalf of Defendant.

---

## Introduction

The above-entitled matter came on for hearing before the undersigned United States District Judge on January 11, 2002, pursuant to Defendant Dentsply International Inc.'s ("Dentsply") Motion for Summary Judgment. By their Complaint, Plaintiffs Michael Stice and Eric Meiners allege a violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a), claiming that Dentsply retaliated against them for their report of sexual harassment. For the reasons stated below, the Court grants Defendant's Motion for Summary Judgment, and Plaintiffs' Complaint is dismissed with prejudice.

## Background

Plaintiffs Meiners and Stice are former employees of Defendant Dentsply, a manufacturer and distributor of dental products. Plaintiff Meiners worked for Dentsply as a sales representative from July 15, 1996, until February 8, 2000. From July 15, 1996, until

FEB 25 2002
FILED
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTD FEB 25 2002
DEPUTY CLERK

March 3, 1997, Meiners worked in the Ash Division; but, on March 3, 1997, Meiners began working with the Alliance Group, a program created to reach a growing customer population of dental practice groups. Plaintiff Stice also worked as a sales representative, starting in September 1994, and began working with the Alliance Group in January 1997. In January 1999, Stice was promoted to regional manager of the Alliance Group with supervisory responsibility over Plaintiff Meiners, and he continued in that capacity until July 29, 1999.

The Alliance Group was created by Jackie Walker, Dentsply's Vice President and General Manager of North American Group Marketing, and Michael Tkaczyk, Director of Sales for the Ash Group and, ultimately, the Alliance Group. Consequently, over the course of their involvement with the Alliance Group, Tkaczyk had supervisory responsibility for both Stice and Meiners. Plaintiffs allege that Tkaczyk's conduct in his supervisory role and Walker's alleged failure to respond adequately to Plaintiffs' complaints constitute actionable retaliation.

Plaintiffs describe various events and conduct by Tkaczyk that they claim amounted to sexual harassment. In March 1997, at a training program attended by both Meiners and Stice, Tkaczyk allegedly told a story to the account executives present (only men) that he once "dangled" his penis in the face of a snoring roommate in order to get him to stop. At the same training program, Tkaczyk is alleged to have told Meiners that "every once in a while you have to suck a little cock, and if you do it enough, you might begin to like it."

Three months later, in May 1997, Tkaczyk accompanied Meiners on a sales call, and, upon Tkaczyk's suggestion, the two had lunch prior to the call in order to role play the presentation. Meiners alleges that Tkaczyk criticized his role play in a very loud and demeaning way and that subsequent to the actual presentation, Tkaczyk said to Meiners: "I took care of you on this one. All you have to do is turn in your invoices and you'll make your number. You owe

me a blow job. When you going to blow me?" Tkaczyk continued to inquire about oral sex numerous times on the way to the car and as they drove away.

During the last quarter of 1997, while on a co-travel sales call, Tkaczyk allegedly said to Stice: "Since I pulled you through this presentation, you owe me a blow job. Come on, you know, God, I really helped you out man. Yeah, seriously, you owe me a blow job. Nothing wrong with giving blow jobs, just as long as you don't like it." During the same co-travel but after a different sales call, Stice placed a call at a pay telephone. As he reached down to retrieve his day planner, Stice alleges that Tkaczyk thrust his crotch to within six to eight inches of Stice's face. On their way to the airport, upon Stice's mention that his girlfriend was from the Czech Republic, Tkaczyk allegedly commented that he knew how to "please" European women given his own Ukrainian heritage.

In January 1998, Meiners, Stice, and Tkaczyk all attended a national sales meeting in Philadelphia. While Stice was standing at a urinal, Stice maintains that Tkaczyk approached him from behind with his hands near his genitals as if he were going to place them on Stice's hip or backside. Stice also alleges that Tkaczyk then told him that "he [Stice] was pretty well hung for a little guy" and that Stice should sue him for sexual harassment and they could split the money. Meiners was in a nearby stall as this incident occurred, and upon his exit, he witnessed Tkaczyk's approach but did not hear any comment.

Also at the national sales meeting, Tkaczyk met with a group of account executives, including Stice and Meiners. After the small group meeting, Tkaczyk took the group to a surprise destination which turned out to be a strip club. At an awards banquet during the meeting, Tkaczyk presented an award to Meiners, announcing that Tkaczyk generally referred to Meiners "as another name for Richard."

In June 1998, in response to Meiners' announcement that his wife was pregnant, Tkaczyk said that a benefit to pregnancy is that the spouse will receive oral sex.

In October 1998, Tkaczyk told Stice about his reputation and experience as a youth, claiming that he had been shot at, that he used to run numbers, and that he once broke a man's leg with a baseball bat as revenge for a fight that occurred years earlier.

Both Plaintiffs maintain that, throughout their employment with Dentsply and aside from the specific incidents outlined above, Tkaczyk frequently used profanity and made references to oral sex in their presence. Plaintiffs indicate that no female employee was ever present during any of the above incidents, with the exception of the incident at the awards banquet, and that they never witnessed Tkaczyk using profanity or making sexual comments to or in the presence of women. Plaintiffs also contend that Tkaczyk was exceptionally critical of their performance, despite their sales success. Dentsply maintains, however, that Stice was known to have a harsh supervisory style and low sales numbers that warranted criticism by Tkaczyk, and that Meiners' job performance needed improvement, particularly in the areas of organization and sales call preparation. Plaintiffs contest such explanations, pointing to sales records which show that both Meiners and Stice had successful sales records during the relevant time period and relative to the other members of the Alliance Group.

**Reports and Investigation**

In November 1998, upon Tkaczyk's request, Stice inquired of Meiners whether anything was bothering him. Based on Meiners response, Stice told Tkaczyk that Meiners was uncomfortable around Tkaczyk and felt that Tkaczyk did not respect him. Tkaczyk called Meiners and said: "What the fuck are you talking about respect for? I give you all the respect you deserve."

Shortly thereafter, in January 1999, Stice became Meiners' supervisor. Over the next several months, Meiners communicated to Stice his discomfort over his working relationship with Tkaczyk. Stice suggested that Meiners report his concerns, and Meiners agreed.

Meiners first contacted John Zick, the Human Resources Director of Dentsply's Preventive Care Division. Because Zick did not have responsibility for the Alliance Group's human resources matters, Meiners next contacted Jackie Walker, the Vice President and manager of the Alliance Group. Walker indicated that Tkaczyk could either be confronted or a human resources investigation could be initiated. Out of concern for retaliation against his career and his person, Meiners requested that human resources become involved.

Glen Weingarth, a Dentsply Human Resources representative, initiated an investigation into Meiners' complaint. Weingarth spoke with Meiners, Stice, and Tkaczyk, both in person and by telephone. Based on Meiners' concern for his physical well-being, Weingarth agreed that Dentsply would reimburse Meiners for the purchase of a home security system. At the close of the investigation, on June 9, 1999, Walker sent a memorandum to Tkaczyk which stated in relevant part:

> You have admitted telling a joke with sexual content and using profanity. . . . [Stice and Meiners] made additional allegations against you, and we found those allegations not completely without credibility. . . . [T]hey are both understandably nervous and worried about retaliation by you. I expect you to successfully manage them without retaliating or creating the appearance of retaliation, which will be difficult. Attached is our Corporate Policy, HR-3, on Sexual Harassment. Glen [Weingarth] and I have reviewed it thoroughly with you today.

In addition, Tkaczyk requested sensitivity training; however, he never attended training due to a scheduling conflict.

**Alleged Retaliation**

Plaintiffs contend that they each experienced retaliation in various ways subsequent to the investigation. Stice directs the Court to two actions that he alleges to have occurred in retaliation for his involvement in the report and investigation of Tkaczyk. First, Stice complains of a 12-week work plan devised by Tkaczyk to increase sales. The plan would have required Tkaczyk, Stice, and Kierce-another regional manager, to travel Sunday through Thursday and to work a sixth day in the office. The plan overlapped with the two-week period when Stice intended to be gone on his honeymoon, so Tkaczyk indicated that Stice would have to make up the two weeks missed at the end of the 12-week period. Second, Tkaczyk scheduled a required meeting in conflict with the long weekend when Stice had already scheduled a deep-sea fishing trip. Based on the timing and nature of these two events, Stice concluded that he was being retaliated against, and he resigned from Dentsply on July 29, 1999. The 6-day work week plan was never implemented.

Meiners also points to several separate events that constitute the alleged retaliation against him. First, Meiners alleges that he was retaliated against because he was informed that he would have to pay taxes on the security system. Second, he maintains that Kierce, his supervisor subsequent to Stice's resignation and a purported close colleague of Tkaczyk, knowingly scheduled a co-travel in conflict with the due date of Meiners' wife. Meiners maintains that Kierce was overly critical of Meiners' performance on the co-travel. Kierce wrote two memoranda of his review of the co-travel, one of which was allegedly sent to Meiners. The other memorandum was not sent because Kierce determined that his tone was harsh. Meiners contends that he did not receive either memo. Both memoranda list each visit made during the co-travel with critical commentary, focusing primarily on a perceived lack of preparedness for

the meetings, an inefficient use of time, and a failure to meet the objectives of the Alliance Group in terms of the target client base and the individuals to whom the actual sales presentation were to be directed.

On August 27, 1999, Meiners contacted Weingarth to complain of a scheduled co-travel with Tkaczyk. By a September 2, 1999, memorandum, Walker agreed that the upcoming co-travel with Tkaczyk and Meiners would not occur. Meiners maintains, however, that he was required to co-travel more often than other sales representatives. Meiners and Kierce co-traveled again in October. A December co-travel with Meiners and Kierce was canceled and rescheduled for January 2000. Kierce filed a memorandum relating to the January co-travel, and again expressed significant concern for and criticism of Meiners' performance.

Anticipating the upcoming national sales meeting in February 2000, at which Tkaczyk would be in attendance, and in light of the events subsequent to the investigation, Meiners resigned on January 21, 2000. His letter of resignation stated:

> Please accept this letter as my formal resignation as Account Executive for the Alliance program of Dentsply International. My decision to resign is directly related to Dentsply's failure to remedy the hostile work environment within Dentsply's Alliance program, which was reported to Dentsply Human Resources in June of 1999. My last day will be February 8, 2000.

Meiners ultimately left the employ of Dentsply on February 8, 2000. Meiners contends that he requested an exit interview, but that despite the assurance of human resources, no one ever got back to him. After receiving Meiners' resignation letter, Walker left a voice mail message stating that she was sorry that things did not work out, that she would like to chat to find out where he was going, that his bonus was still "up for the taking," and that she wished him the best of luck.

Plaintiffs filed the current action, alleging retaliation in violation of Title VII; and Defendant now seeks summary judgment on Plaintiffs' claim.

**Discussion**

**1. Standard of Review**

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court must view the evidence and the inferences which may be reasonably drawn from the evidence in the light most favorable to the nonmoving party. *Enterprise Bank v. Magna Bank of Missouri*, 92 F.3d 743, 747 (8th Cir. 1996). However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" Fed. R. Civ. P. 1. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enterprise Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record which create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986); *Krenik*, 47 F.3d at 957.

**2. Issues**

**a. In General**

In *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), the U.S. Supreme Court set forth a three-stage burden-shifting test that has been consistently applied in discrimination cases. *See Ryther v. KARE 11*, 108 F.3d 832, 836 (8th Cir. 1997) (adopting *McDonnell Douglas* test as applied in *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 520 (1993).). The first stage requires that the plaintiff establish a *prima facie* case of discrimination. *Ryther*, 108 F.3d at 836. If the plaintiff is successful, then the burden shifts to the defendant who is required to provide evidence of a valid, non-discriminatory reason for the alleged discriminatory conduct. *Id.* Should the defendant produce such evidence, then the burden shifts back to the plaintiff requiring him/her to prove intentional discrimination. *Id.* The plaintiff is not required to present new evidence at this stage. Instead, it is sufficient for the plaintiff to rely on the evidence presented to establish the *prima facie* case coupled with the claim that the defendant's reason is mere pretext. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2108-09 (2000).

Plaintiffs' sole claim in this action is a claim of retaliation. Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-3, makes it unlawful for an employer to discriminate against an employee, for among other things, "because he has opposed any practice made an unlawful employment practice by this subchapter." In order to establish a claim of retaliation, a plaintiff must show that: (1) he engaged in a protected activity; (2) adverse employment action occurred; and (3) there is a causal connection between the two. *Womack v. Munson,* 619 F.2d 1292, 1296 (8th Cir. 1980), *cert. denied*, 450 U.S. 979 (1981); *Scusa v. Nestle U.S.A. Co., Inc.,* 181 F. 3d 958, 968 (8th Cir. 1999).

**b. Prima Facie Case**

In order to establish that Plaintiffs engaged in a protected activity, they must show that they had a good faith reasonable belief that the conduct about which they complained constituted sexual harassment. *Buettner v. Arch Coal Sales Co., Inc.*, 216 F. 3d 707, 714-15 (8th Cir. 2000). It is not necessary for them to show that the conduct constituted sexual harassment *in fact*. *Id.* Defendant challenges Plaintiffs' evidence on this element, claiming that Plaintiffs have failed to show that they were subject to Tkaczyk's conduct *because of* their sex and that they did not believe such conduct was sexually harassing. The Court disagrees.

Plaintiffs allege that, to their knowledge, female sales representatives were not subject to Tkaczyk's profane language or conduct and did not witness the incidents of which Plaintiffs ultimately complained. To the extent that Plaintiffs indicate by their deposition testimony that this case is not about sexual harassment, the Court finds that a dispute of fact has been created. Defendant contends that, based on the deposition testimony, the only conclusion to be drawn is that Plaintiffs could not have had the requisite good faith belief; however, in light of the record as a whole, the Court declines to reach such a conclusion as Defendant would have it, based on isolated portions of deposition testimony. Viewing the evidence in the light most favorable to the Plaintiffs, the Court finds that a reasonable trier of fact could find that Plaintiffs had a good faith reasonable belief that Tkaczyk's conduct constituted sexual harassment.

That said, however, Plaintiffs are unable to establish either of the second two elements of their prima facie case, and thus their claim must fail. With respect to the second prong, "[e]mployment actions which do not result in changes in pay, benefits, seniority, or responsibility are insufficient to sustain a retaliation claim." *Buettner*, 216 F.3d at 715 (citing *Flannery v. Trans. World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir. 1998)). Neither Stice nor

Meiners makes an allegation that they experienced a change in pay, benefits, seniority, or responsibility subsequent to the investigation of Tkaczyk's conduct. Instead, Stice's complaints relate mainly to scheduling and workload. While the Court does not conclude that changes short of those listed above cannot constitute an adverse employment action, *see*, *e.g.*, *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir. 1997), the Court finds, as a matter of law, that the conduct in this case did not cause a materially significant disadvantage to Stice's employment. *Id.* (citing *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir.1994)). Stice was subject to a single scheduling conflict, which only imposed the additional responsibility of attendance at an albeit inconvenient meeting, and the 6-day work plan was never implemented. Moreover, there is no evidence in the record that Stice reported his concern nor attempted to resolve the scheduling conflict in any way.

With respect to Meiners's claim, the Court also finds, as a matter of law, that he has failed to show that the scheduling of co-travels and the subsequent negative reports caused a material disadvantage in his employment. Even if such actions could be found to constitute adverse employment actions against Meiners, however, Meiners has failed to establish a causal connection between the report and investigation and the allegedly adverse actions. While the timing of the adverse employment action and the protected activity may be sufficient to establish a causal connection, *see*, *e.g.*, *Rath v. Selection Research, Inc.*, 978 F.2d 1087, 1090, (8th Cir. 1992), generally, more than a temporal connection is required to establish that the issue of retaliation remains for the fact-finder to determine. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999). Here, Meiners directs the Court solely to the timing of the events as evidence of the requisite causal connection. Without more, Meiners cannot meet his burden of establishing a causal connection.

Notwithstanding any temporal proximity, however, Meiners points to insufficient evidence to create a dispute as to whether Defendant's explanation of its actions is mere pretext. Defendant explains the additional co-travels and negative reports as legitimate responses to Meiners' job performance. To discredit this explanation, Meiners points to one positive co-travel report by Walker and Meiners' aggregate sales figures. The Walker co-travel and report occurred in March 1998, months prior to the report and investigation. In addition, the criticisms that Kierce documents in his reports do not necessarily relate to the sales numbers that Meiners obtained, but rather the manner in which he performed his job. Despite the timing of the co-travels and reports, Meiners does not challenge the substance of the criticism and therefore the purported reason for the additional co-travels. While the Walker co-travel may have been a success, it does not follow necessarily that the Kierce travels were as well. While the Court does not conclude that additional co-travels and negative reports cannot be motivated by a retaliatory intent, Meiners has directed the Court to no evidence in the record to show that the criticism of the co-travels was unfounded, but rests merely on his allegation that their timing is determinative. Viewing the evidence before the Court in a light most favorable to Meiners, the Court finds that there is insufficient evidence for a reasonable fact-finder to conclude that Defendant's explanation for the additional co-travels and negative reports was merely pretextual.

To the extent that Plaintiffs make an argument for constructive discharge as the adverse employment action that they suffered in retaliation for their report, the Court finds insufficient evidence to support such a claim. "A constructive discharge occurs when an employer, through action or inaction, renders an employee's working conditions so intolerable that the employee essentially is forced to terminate [his] employment." *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000). A plaintiff must provide the employer a reasonable opportunity to

resolve the "unreasonable working condition[s]" before terminating his employment. *Henderson*, 217 F.3d at 617. If a reasonable opportunity is granted and no remedial action is taken, or the employee reasonably believes that there is no chance of fair treatment, then the employee has been constructively discharged. *Id.*

There is no evidence that Stice made any attempt to notify Defendant of the actions that he perceived to be in retaliation for his involvement in the investigation. The only report made by Meiners, in relation to the potential Tkaczyk co-travel, prompted an immediate cancellation of the co-travel. Plaintiffs seem to be relying on their contention that Dentsply took no apparent action to follow up after the investigation to check in with Plaintiffs. While such action may have been a better course for Dentsply to follow, there remains insufficient evidence that could show that any attempt by Stice or Meiners to communicate their concerns would have been futile.

In conclusion, the Court finds that Plaintiffs have failed to create a dispute of material fact with respect to whether they suffered adverse employment actions by Defendant that were causally related to their report against Mike Tkaczyk. Accordingly, the Court finds summary judgment to be appropriate in favor of Defendant. That being said, the Court finds the underlying conduct of which Plaintiffs complained and attributed to Tkaczyk to be nothing short of reprehensible. Defendant certainly has the responsibility as an employer to ensure that its employees work within a respectful and safe working environment. However, such responsibility is shared by the employees who create that environment, and if the allegations are true, it is the Court's belief that Tkaczyk wholly failed to meet his share of the responsibility as a supervisor and fellow employee.

For the reasons stated, **IT IS HEREBY ORDERED** THAT:

1. Defendant's Motion for Summary Judgment (Doc. No. 10 & 11) is **GRANTED**;

and

2. Plaintiffs' Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 25, 2002

DONOVAN W. FRANK
Judge of United States District Court

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information must be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*